PER CURIAM.
The Florida Bar appeals from a referee’s report recommending a three-year suspension for Edward Pedrero. We have jurisdiction under article V, section 15, of the Florida Constitution and chapter 1 and rule 3-3.1 of the Rules Regulating The Florida Bar.
The referee made the following findings of fact:
In approximately August, 1983, Respondent met Daryl John Christian at DACCO [a drug rehabilitation center] in Tampa, Florida.
In approximately January, 1984, Mr. Christian left DACCO and contacted the Respondent. The Respondent provided Mr. Christian with the birth certificate of Nelson Lee Burchfield....
At Respondent’s direction, Mr. Christian assumed the identity of Nelson Lee Burchfield until Mr. Christian’s arrest by Federal authorities on March 19, 1986.
In approximately March, 1985, Respondent gave Mr. Christian the birth certificate of John Fernandez, a friend or acquaintance of Respondent. Mr. Christian used the identity of John Fernandez to acquire credit cards in that name. Respondent was aware of the fact that Mr. Christian intended to use the birth certificate of John Fernandez for the aforementioned purpose.
Sometime after March, 1985, Respondent gave Mr. Christian money with which to open bank accounts in the Tampa Bay area under the name of John Fernandez. One bank in which such an account was opened was the Landmark Bank, now C & S Bank, in St. Peters-burg. This information was confirmed by Special Agent Walter Tuller in his meeting with Roeco Ramirez from C & S *843 Bank. Mr. Christian then used the credit cards obtained in the name of John Fernandez to purchase merchandise and to receive cash advances. Mr. Christian shared these fraudulently obtained items with the Respondent. The Respondent admitted this conduct to Agent Tuller in April, 1986.
Mr. Christian also used the identity of John Fernandez to obtain a U.S. passport. In approximately May or June, 1985, Mr. Christian used the aforementioned passport to travel to Amsterdam at the direction of Respondent to purchase a quantity of diamonds and hashish.
On May 23, 1985, Respondent was admitted to the Florida Bar. In approximately May, 1985, Respondent gave Mr. Christian a Social Security card in the name of John Richmond Melton. Mr. Christian then acquired credit cards in the name of John Richmond Melton and used these cards to purchase merchandise and receive cash advances. Mr. Christian shared these ill-gotten gains with the Respondent.
In approximately August, 1985, Mr. Christian again traveled to Amsterdam to purchase drugs. While in Amsterdam, Mr. Christian met Peter Corby, an Australian. Mr. Corby sold Mr. Christian some heroin which was then smuggled back into the United States where Mr. Corby delivered five to ten grams of the heroin to Respondent.
In late July, 1985, Respondent began to represent David G. Pavlick on the charges of driving with a suspended license and driving under the influence of alcohol.
At the time of his arrest, David Pavlick was using the driver’s license of his twin brother, Douglas.
In August, 1985, David and Douglas Pavlick went to the Clearwater courthouse to be fingerprinted to clear up the confusion in their identities caused by David’s use of Douglas’ driver’s license. The Respondent used this opportunity to obtain the fingerprints of Douglas Pav-lick which he then used to obtain the identification of Douglas Pavlick. This identification was given to Mr. Christian by the Respondent for the purpose of Mr. Christian obtaining credit cards and bank accounts in the name of Douglas Pavlick.
The Respondent attempted to cover his tracks for the aforementioned transaction by filing a report with the Pinellas County Sheriff’s Department.... [In one of his exhibits], the Respondent is reported to have stated that sometime after David Pavlick’s trial date, Daryl Christian broke into his car and stole the Pavlick file. In his affidavit submitted to the referee and in his testimony, however, the Respondent stated that both Daryl Christian and Mr. Corby took the file from the trunk of his ear. In addition, Respondent told the referee that his trunk was unlocked and not that his car was broken into. The Respondent did not report this alleged theft until two months after Mr. Christian had implicated the Respondent to the Secret Service and over nine months after the alleged theft.
The Respondent admitted before the referee to using a fraudulently obtained credit card to purchase merchandise from a clothing store in Tampa, Florida. Agent Tuller testified that the card used by Respondent was in the name of John Melton. The Respondent also admitted to purchasing merchandise from one of the Iranian men whom he later claims to have been threatening him.
On February 24,1986, Respondent purchased $4,500 worth of Citicorp Travelers Cheques at the Freedom Savings office in Largo, Florida. While at the Freedom Savings, the Respondent refused to use the bank’s pen but rather used a pen with erasable ink which he had brought with him to the bank. In appears that the Respondent then erased his name from the travelers cheques and, in a shaky hand, wrote his name apparently to make it appear as if the cheques had been forged. The Respondent did this with $800 worth of the cheques. The remaining $3,700 was given to Mr. Christian for Mr. Christian to take to *844 Amsterdam to purchase narcotics. Mr. Christian used the name John Fernandez on the travelers cheques.
On February 25, 1986, Respondent cashed $800 worth of the travelers che-ques that he had kept in his own name.
On February 26, 1986, Respondent reported to the bank that the balance of the $4,500 in travelers cheques were missing. At the time Respondent made this false report, he knew that the travelers cheques were in the possession of Daryl Christian.
On February 27, 1986, Respondent called Citicorp and falsely reported the cheques as being missing. Subsequently, the Respondent received a full refund of $4,500 from Citicorp.
On April 10, 1986, after his meeting with the Secret Service agents and with the United States attorney’s office, Respondent made restitution to Citicorp for the $4,500.
The referee finds that the affidavit of Daryl John Christian is supported by the independent investigation conducted by the Special Agent Walter Tuller. In addition, the Respondent admitted to engaging in the conduct set forth in Mr. Christian’s affidavit when the Respondent met with the Secret Service on April 1, 1986.
Special Agent Tuller testified Respondent’s fingerprints and handwriting were found on several false credit card applications. The Respondent admitted to Agent Tuller that he filled out these applications.
In response, the Respondent has submitted an affidavit, in lieu of his testimony, with the referee’s permission, but the Bar was given full opportunity to cross-examine the Respondent within the scope of the matters set forth in the affidavit.
The affidavit provides credence to the findings made in the psychological examinations of Respondent that to him “fantasy and reality are often seen as the same,” ... [R]eport of Dr. Walter E. Afield....
I find the Respondent’s affidavit to be incredible in almost every relevant detail. Moreover, I am of the view, and so find, that it is replete with intentional falsehoods calculated to mislead, if not to deceive, the referee. Accordingly, I reject the affidavit and, indeed, consider it more damning than exculpatory.
The most damning affirmative evidence of all, however, consists of the tapes which surreptitiously recorded the conversations between the Respondent’s co-conspirator, Mr. Christian, and the Respondent in March, 1986. The tapes clearly show that the Respondent was a knowledgeable, willing and active participant in the unlawful activities of Daryl Christian. There is no sign of any coercion, duress, or intimidation of the Respondent by Daryl Christian, nor is there any sign of fear in the Respondent’s voice, further [discrediting] much of Respondent’s affidavit. On the contrary, it appears that the Respondent was fully in charge of the situation and was already making plans to establish his own defense in this matter and to assist Daryl Christian in establishing his.
The referee went on to find Pedrero guilty of violating three rules of discipline under the now-superseded Code of Professional Responsibility: D.R. 1-102(A)(3) (engaging in illegal conduct involving moral turpitude); D.R. 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and D.R. 1-102(A)(6) (engaging in any other conduct adversely reflecting fitness to practice law).[1] He found Pedrero not guilty of two other charges.
The referee found mitigation in Pedre-ro’s “severe mental problems.”
“I am persuaded, indeed, that he is borderline schizophrenic, which is substantiated by [two doctors’ reports]. Additionally, it is my own evaluation, based on experience, in observing the Respondent during the proceedings and by analyzing the Respondent’s Affidavit submitted in lieu of testimony ... that clear *845 ly, he suffers from serious psychiatric and emotional problems, although [he is] not incompetent.”
The referee also considered Pedrero’s age, date of his admission to the Bar, absence of prior disciplinary proceedings and “most importantly, the fact that he is presently undergoing, and expressed an intention to continue, psychiatric- treatment and counseling.”
The referee recommended a three-year suspension from the practice of law, but made the suspension retroactive to July 8, 1987, the date the Court temporarily suspended Pedrero, and “thereafter until Respondent shall prove that he has continued psychiatric counseling and treatment and has reached that degree of emotional and mental rehabilitation which would permit him responsibly to assume the high responsibilities of a member of the Florida Bar.”
Pedrero does not appeal. Though he says he is “in serious disagreement with the Findings of Fact, [he] chose not to seek review based on his personal psychiatrist’s opinion that in order to continue successful therapy, the matter must be ‘put behind and cognitively resolved.’ ” In a footnote, Pedrero mentions the report of Dr. Hector Corzo, dated March 25, 1988, which states that Pedrero has been “emotionally rehabilitated.”
The Bar does not dispute the referee’s findings of guilt. It argues, however, that based on Pedrero’s conduct disbarment is warranted; Bar counsel said on the record in the hearing that the Bar would have no objection to the disbarment being retroactive to the suspension order. Pedrero contends that the sanctions are adequate.
The one issue we must decide is whether the referee’s recommended punishment is appropriate. Lawyers have been disbarred for less serious transgressions. In The Florida Bar v. Price, 478 So.2d 812 (Fla.1985), this Court approved a referee’s report that disbarred an attorney who engaged in some of the conduct of which Pedrero was guilty. Like Pedrero, Price helped import drugs into the United States, claimed he was coerced, and was not believed by the referee.[2] Unlike Pedrero, Price was not accused of multiple acts of importing drugs or of fraud. In The Florida Bar v. Bryan, 506 So.2d 395 (Fla.1987), we disbarred an attorney whose credit card fraud amounted to $1,767. Pedrero’s credit card fraud greatly exceeded that amount. Thus we find that the Pedrero’s conduct is worthy of disbarment. The remaining question is whether the mitigating factors as found by'the referee warrant the imposition of any lesser sanction.
Pedrero claims that he became emotionally devastated in 1982 when his mother committed suicide and, a year later, his grandmother died. The doctors’ reports support his contention, but neither found him insane. No doubt Pedrero’s mental condition contributed to his bizarre and immoral conduct. However, we are not prepared to say that his emotional problems sufficiently mitigate his conduct, especially where the findings of fact substantially contradict the mitigating effect of the medical evidence.
The gist of the doctors’ reports is that Pedrero was depressed, had difficulty in distinguishing fact from fantasy, was easily led by Daryl Christian, and had been rehabilitated. Yet, the referee found, based on the surreptitious tape recording, that Pedrero was not led by Christian but in fact was in control of the situation. The referee also found that the affidavit, which was prepared at the time Dr. Corzo found Pedrero to be “ethical” and “rehabilitated,” was “incredible in almost every relevant detail,” and “replete with intentional falsehoods calculated to mislead, if not to deceive, the referee.” Despite his belief that the affidavit lent credence to Dr. Afield’s report that Pedrero often confused fantasy and reality, the referee specifically found that the affidavit was not the product of a clouded mind but one intent on deception.
Clearly, Pedrero was suffering from depression which tended to cloud his judgment. However, this is not a case where the lawlessness of the conduct is subject to subtle shadings and picayune interpreta *846 tions of technical rules. Any layperson of even less than average intelligence and sophistication would know that what Pedrero did was illegal. The public and the legal profession cannot tolerate the type of conduct engaged in by Pedrero. Absent a finding of incompetency, Pedrero’s actions were so reprehensible that disbarment can be the only sanction.
Edward Pedrero is hereby disbarred from the practice of law and shall not be eligible to reapply until five years from the date of his temporary suspension, which was July 8, 1987. Costs of these proceedings shall be taxed against Pedrero upon motion of the Bar.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDonald, shaw, barkett, GRIMES and KOGAN, JJ., concur.

. The record does not indicate that any criminal charges have been brought against Pedrero. Christian was sentenced to five years in federal prison.

. Price was tried and acquitted of criminal charges arising from this incident.